UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

vs.                        REPORT AND RECOMMENDATION

Martin Vega Hernandez a/k/a
Emanuel, and Michael Eugene
Seebeck,

        Defendants.      Crim. 06-379 (02)(10)(MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendants Martin Vega Hernandez ("Hernandez"), and Michael Eugene Seebeck  ("Seebeck"):

    1.      Hernandez's Motion to Suppress Eyewitness Identification.

    2.      Seebeck's oral Motion to Suppress Statements.

    3.      Seebeck's oral Motion to Suppress Evidence Obtained as a Result of Search and Seizure.

A Hearing on the Motions was conducted on July 2, 2007,[1] at which time, Hernandez appeared personally, and by George E. Rapaich, Esq.; Seebeck appeared personally, and by Bruce R. Williams, Esq.; and the Government appeared by W. Anders Folk, Assistant United States Attorney.  For reasons which follow, we recommend that the Defendants' Motions be denied.

## II. Factual Background

The Defendants are each charged with one Count of Conspiracy  to distribute, and to possess with intent to distribute, methamphetamine, in violation of Title 21 U.S.C. §§841(a)(1), 841(b)(1)(A), and 846.   Hernandez is also charged with two (2) Counts of distributing methamphetamine, in violation of Title 21 U.S.C. §§841(a)(1), and (b)(1)(B),  and Title 18 U.S.C. §2.  Additionally, Seebeck has been charged with one (1) Count of distributing methamphetamine, in violation of Title 21 U.S.C. §§841(a)(1), and (b)(1)(A); and two (2) Counts of possession with intent to distribute methamphetamine, in violation of Title 21 U.S.C. §§841(a)(1), and 841(b)(1)(C).

---

[1] At the close of the Hearing, counsel for Seebeck requested that he be allowed until July 9, 2007, to raise any objections to several of the Government's Exhibits, given that he had not had an opportunity to review the materials.  Leave was granted, and the last submission, on the issues presented, was received on July 12, 2007, at which time, the Motions were taken under advisement.  See, Title 18 U.S.C. §3161(h)(1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-77 (8th Cir. 1995).

The events that gave rise to the conspiracy charge are alleged to have occurred during the period from January 1, 2000, until October 31, 2006; the events that gave rise to the distribution charges, as alleged against Hernandez, are said to have occurred from on or about September 1, 2006, through September 7, 2006, as well as on September 8, 2006.  The events that gave rise to the distribution charges, as alleged against Seebeck, are alleged to have occurred during the period from June 1, 2006, until October 16, 2006, while the events that gave rise to the possession with intent to distribute charges, as alleged against Seebeck, are alleged to have occurred on October 17, 2006, and February 8, 2007.  All of the events are alleged to have occurred in this State and District.  As pertinent to those charges, and to the Motions now before us, the operative facts may be briefly summarized.[2]

At the Hearing, Rodney Wilson ("Wilson"), who is an Investigator with the Duluth Police Department, who is deputized by the Bureau of Alcohol, Tobacco, and

---

[2]Rule 12(d), Federal Rules of Criminal Procedure, provides that, "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

Firearms ("ATF"), and who is assigned to the Lake Superior Drug and Gang Task Force ("Task Force"), testified at the instance of the Government.

Wilson testified that, since 2005, he has been directly involved in law enforcement's investigation of a drug trafficking organization, which had been responsible for the distribution of large quantities of methamphetamine in the Duluth area. He stated that he was familiar with the named Defendants, and that they were all implicated in the trafficking of methamphetamine. He also stated that, as part of his law enforcement duties, he has conducted numerous photographic lineups, and had conducted interviews with a number of criminal suspects.

With respect to the investigation into Hernandez's connection to the drug trafficking organization, Wilson testified that Jeffrey Kazel ("Kazel"), who is an Investigator with the Duluth Police Department, assembled a photographic array of six (6) persons, from driver's license records that are maintained by the Minnesota Department of Public Safety, Driver and Vehicle Services ("DVS"). Kazel sought photographs which depicted persons who had the same general height, weight, hair color, eye color, and physical characteristics of Hernandez -- including a mustache. Wilson stated that Hernandez's photograph was included in the lineup, because his name appeared on a number of documents that were obtained during the course of a

vehicle search and arrest, which had yielded a half-pound of methamphetamine. Wilson was uncertain if any other photographic lineups were conducted using the photographs of others whose names also appeared in the same documents.

Subsequently, Wilson and Kazel met with a cooperating Defendant at a secure field location, and advised that they would be showing a set of six (6) photographs which might, or might not, include a person who the cooperating Defendant would recognize.  In addition, Wilson stated that the cooperating Defendant was never told that a suspect would be included in the lineup.  See, Government Exh. 2.[3]  Wilson testified that the cooperating Defendant immediately, and without equivocation, selected photograph number two (2) on the photo display, and identified the person

------

[3]Government Exh. 2 includes a black and white depiction of the photographic array that was used, by Wilson and Kazel, in the identification of Hernandez.  At the time of the Hearing, the Government offered the black and white version of the display, which bore Kazel's handwriting.  The document was purportedly redacted, so as to remove any notation which would reveal the identity of the cooperating Defendant.  At our request, and without objection from the Defendants, the Government was directed to provide a color copy of the array, as it had been displayed to the cooperating Defendant and, on July 2, 2007, the Government produced a color copy of the photographic array.  By our observation, the complexion, and hair length of each photographic depiction, was not appreciably distinct, and although some of the depicted persons appear to have slightly less of a visible mustache than Hernandez, none of the facial features are unduly distinctive.

depicted as "Emanuel," and as a supplier of methamphetamine.  Photograph number

two (2) depicts Hernandez, who has also been charged with an alias of "Emanuel."

As related by Wilson, the cooperating Defendant professed familiarity with

Hernandez, as they had met together on several previous occasions over a span of six

(6) months, at a frequency of once every two (2) or three (3) days.  On cross-

examination, Wilson noted that several of those meetings were with couriers,

reportedly under the direction of Hernandez, but that Hernandez personally appeared

at several of the referenced meetings.

In regard to the statements made by Seebeck to law enforcement, Wilson

testified that Seebeck provided statements on two (2) separate occasions -- namely,

on October 18, 2006, at the St. Louis County Jail, and on February 8, 2007, at the

Duluth Police Department.   On both occasions, the Government concedes that

Seebeck was being held in custody, and contends that Seebeck was advised of his

rights under Miranda v. Arizona, 384 U.S. 436 (1966), prior to commencing the

interviews.  Wilson testified that the interview in October of 2006, was not recorded,

while the statement made on February 8, 2007, was recorded, and a videotape of that

recording has been admitted as an Exhibit.  See, Government Exh. 7.  Seebeck made

several statements, prior to the reading of the <u>Miranda</u> advisory, and he seeks the suppression of those statements.  See, <u>Docket No. 245</u>.

As previously related, the first interview was conducted at the St. Louis County Jail, on October 18, 2006 -- one (1) day after the execution of a Search Warrant at Seebeck's residence.  Wilson and Seebeck were present at the interview, as was Darin Nemerow ("Nemerow"), who is a Special Agent with the ATF, Saint Paul Field Division, and who has been involved in the investigation since its inception.  Wilson and Nemerow went to the St. Louis County Jail, and requested to speak with Seebeck. Wilson testified that Nemerow read the complete <u>Miranda</u> advisory from a pre-printed card, and advised Seebeck of his right to remain silent and to seek the assistance of an attorney, and that anything he said could be used against him.  Seebeck stated that he understood and waived those rights, and agreed to speak with Wilson and Nemerow.

Wilson testified that Seebeck appeared to understand his rights, and that, during the interview, Seebeck never asked to stop the interview, to speak with an attorney, or to refrain from answering a question.  Wilson related that, prior to the interview, Seebeck's handcuffs were removed, and that no promises or threats were made to Seebeck, no physical force was threatened, and that Wilson and Nemerow identified

themselves as law enforcement, and provided their credentials, to Seebeck.  Wilson testified that Seebeck was familiar with Wilson from Seebeck's prior contacts with law enforcement.  At no time was Seebeck asked if he was represented by counsel, and Wilson stated he had no knowledge that Seebeck might be represented, nor any reason to suspect Seebeck had retained counsel.  Wilson related that, if he knew that a suspect was represented, then he would call the suspect's attorney prior to questioning.

The interview was conducted in a locked room at the Jail, where Seebeck was clothed in a standard Jail-issued jumpsuit, and seated on a chair.  No weapons were displayed throughout the interview.  Wilson testified that the interview was not recorded because he did not have any recording equipment present, and that he believed the interview room was not fitted with any videotaping equipment.  Wilson stated that Seebeck related, during the course of the interview, that the methamphetamine, which was recovered from his residence was his, that he had been selling it in Duluth, and that he had identified his supplier.  The interview lasted for somewhere between thirty (30) and forty-five (45) minutes, and was conducted at approximately 3:00 o'clock a.m.

On February 8, 2007, a second interview commenced -- this time at the Duluth Police Department -- after Seebeck was arrested following the execution of a second Search Warrant, and lasted for approximately one and a half (1.5) hours.  According to Wilson, the interview commenced approximately one (1) hour after Seebeck was placed into custody.

At the beginning of that interview, Wilson, and Nemerow, spoke with Seebeck. They explained that Seebeck was there on suspicion of dealing methamphetamine, as had been the case before his previous statement, after the execution of a Search Warrant on Seebeck's residence and person, and they explained to him that he was under arrest.  They stated that they would like to speak with him, that, since he was under arrest, they would have to read him the Miranda advisory prior to asking him any questions, and that they then asked him if he was willing to speak with law enforcement.

Seebeck responded that he would like to talk for five (5) minutes prior to receiving the Miranda advisory, because of his concern that he would provide statements that would be used against him.  Wilson and the other law enforcement officer told Seebeck that they could not speak with him without first advising him of his rights, and receiving a waiver of those rights.  Seebeck responded that he had been

cooperative before, when he spoke to law enforcement, but that the bail in connection with his previous charge was set at an amount he found to be excessive, and that he was hoping to receive some "love back" in the form of guarantees.  Wilson and Nemerow explained that they could not make any guarantees as to any bail amounts, or as to any other matter.  Seebeck requested that his handcuffs be loosened, at which time, Wilson adjusted Seebeck's handcuffs.

Nemerow then explained that the procedure for conducting an interview was the same as on the previous occasion, and that he could not be out, again, dealing methamphetamine.  Seebeck then engaged in the following soliloquy:[4]

> I'm starving to death, man.  It's not like I can go rent a place or do -- life's rough, that's the truth.  I'm not gonna, you know.  No I ain't been f***ing dealing meth.  Not enough to f***ing get by.  Not barely survive -- starving to death, that's the truth.  Think my rent's paid?  I ain't got private lawyer.  F***ers are out running around -- running amok -- way worse than anything I've f***ing have conducted lately. [Laughter].

Government Exh. 7.

---

[4]No transcript of the interview has been provided, and accordingly, we have reproduced the content of Seebeck's statement  from our review of the videotape.  It is this statement that the Government represents that it will not seek to introduce during its case-in-chief.  See, Docket No. 248.

Wilson explained that they knew a lot more than Seebeck thought, and that he wanted to know if Seebeck wanted to talk to them, but that it was ultimately Seebeck's choice. Wilson explained that Seebeck would be facing possession of methamphetamine charges, and stated that Seebeck was free to talk to law enforcement, but that he was under no obligation to do so, and that it was his choice.

After the reading of the Miranda advisory, Seebeck waived his rights.  During the interview, Wilson asked Seebeck if he was under the influence, and Seebeck responded "possibly yeah."   Seebeck asked to go on to the next question, at which time, Wilson asked him if he understood the questions that were now being posed to him.  Seebeck was asked if he knew the date, at which time he responded accurately. He also recounted the earlier events of the day.  He recalled fixing his truck and visiting Superior, Wisconsin. Seebeck further stated that he had consumed an unspecified amount of marijuana, right before law enforcement's arrival at his residence, but that he possessed a clear mind, and that he had no problem understanding, or truthfully responding to, law enforcement's questioning.

At the Suppression Hearing, Wilson testified that, given his experience with persons under the influence of controlled substances, Seebeck was not demonstrably impaired, such that he would not understand the questioning, or the impact of waiving

his rights. Wilson further testified that no psychological intimidation, or strategems, were employed during the interview.  Wilson testified that Seebeck responded appropriately to the questions that were asked of him, and that he would have terminated the interview immediately if Seebeck demonstrated a lack of capacity.

A break in the interview occurred when Seebeck asked to call the mother of his children, and he was afforded that opportunity, as well as being provided some water through the course of the interview.  At no time during the interview did Seebeck ask to speak with an attorney, or for the interview to terminate.  Further, Wilson and Nemerow repeatedly emphasized that it was Seebeck's choice to truthfully answer law enforcement's questions, but that they could not make any guarantees or written deals. The interview ended after over an hour and a half, and Seebeck was transported to the St. Louis County Jail.

### III.  Discussion

A.    Hernandez's Motion to Suppress Eyewitness Identification.

1.    Standard of Review.  Generally speaking, in cases in which the identity of the accused is at issue, the accused may move, under the Due Process Clause, to suppress an out-of-Court identification that was secured by law enforcement officials through improper means.  See, Neil v. Biggers, 409 U.S. 188,

199 (1972).  Moreover, the Due Process challenge will extend to an anticipated in-Court identification if it was tainted by the erroneous out-of-Court procedures.  See, Foster v. California, 394 U.S. 440, 443-44 (1969); United States v. Tucker, 169 F.3d 1115, 1117-18 (8th Cir. 1999); Williams v. Lockhart, 736 F.2d 1264, 1266 (8th Cir. 1984).

Where, as here, an out-of-Court identification, through the use of an accused's photograph, is at issue, our Court of Appeals uses a two-step admissibility analysis first adopted by the Supreme Court in Manson v. Brathwaite, 432 U.S. 98, 116 (1977).  See, United States v. Boston, --- F.3d ---, Slip Op., No. 06-4137 at p. 7 (8th Cir., July 16, 2007);  United States v. Daily, --- F. 3d ---, 2007 WL 1628334 at *7 (8th Cir., June 7, 2007), citing United States v. Donelson, 450 F.3d 768, 772 (8th Cir. 2006); United States v. Martin, 391 F. 3d 949, 952-53 (8th Cir. 2004); United States v. Gipson, 383 F.3d 689, 698 (8th Cir. 2004);  United States v. Johnson, 56 F.3d 947, 953 (8th Cir. 1995).  First, the Court must determine whether the challenged photographic identification procedure was "impermissibly suggestive."  See, United States v. Boston, supra at 7; United States v. Gipson, supra at 698; see also, United States v. Johnson, supra at 953; Manson v. Brathwaite, supra at 116.

Then, should it be determined that the procedures were impermissibly sugges-

tive, the Court must determine if the identification was, nonetheless, reliable.  See,

United States v. Daily, supra at *8 ("Because the pretrial identification procedure was

not impermissibly suggestive, we need not inquire as to the reliability of the

identification."), citing United States v. Martin, supra at 952; Clark v. Caspari, 274

F.3d 507, 511 (8th Cir. 2001); Thomas v. Bowersox, 208 F.3d 699, 702 (8th Cir. 2000);

United States v. Davis, 103 F.3d 660, 669 (8th Cir. 1996), cert. denied, 520 U.S. 1258

(1997) ("Reliability is the linchpin in determining the admissibility of identification

testimony * * *.")[internal quotation omitted]; see also, Williams v. Lockhart, supra

at 1266 (concluding that not all suggestive identification procedures violate due

process).

Consequently, the identification evidence will be admissible at Trial unless the

totality of circumstances demonstrates that the impermissibly suggestive procedures

"created a very substantial likelihood of irreparable misidentification."  United States

v. Boston, supra at 7, citing and quoting, United States v. Donelson, supra at 773;

United States v. Gipson, supra at 698, citing United States v. Johnson, supra at 953;

see also, Clark v. Caspari, supra at 513 (Hansen, C.J., concurring), quoting Manson

v. Brathwaite, supra at 116-17.  To determine reliability, five factors are to be

considered:  the opportunity of the witnesses to view the defendant at the relevant time; the witnesses' degree of attention when viewing the defendant; the accuracy of the original descriptions given by the witnesses; the level of certainty in their identifications; and the passage of time between their observations of the defendant and the photographic identifications.  See, United States v. Gipson, supra at 698; Manson v. Brathwaite, supra at 114.

2.    Legal Analysis.  Based upon the totality of the circumstances, we find nothing impermissibly suggestive about the photographic array.   The photo spread depicts six (6) males of the same race, and of the same general age, appearance, and demeanor.  In addition, all of the individuals have similar haircuts, and facial hair -- namely, a mustache.  There is nothing about the photo spread which tends to isolate Hernandez's picture, or otherwise emphasizes his features, so as to cause an identification based on something other than the witness' own recollection.  See, United States v. Mays, 822 F.2d 793, 798 (8th Cir. 1987)("[I]n the absence of differences in appearance tending to isolate the accused photograph, the identification procedure is not unnecessarily suggestive.").

We further find that the presentation of the photo array to the cooperating Defendant was not unnecessarily suggestive, particularly since Wilson and Kazel said

nothing to suggest which photograph should be selected, nor did they so much as intimate that they had identified a likely suspect, or that the lineup contained a photograph of the suspect. On this Record, based on the totality of the circumstances, there is no basis upon which to find that the photographic display was unnecessarily suggestive, or was otherwise unconstitutionally infirm.[5] Accordingly, we recommend that Hernandez's Motion to Suppress Eyewitness Identification Testimony be denied.

B.     Seebeck's Motion to Suppress Statements.

1.     Standard of Review. Government agents are not required to administer Miranda warnings to everyone they question. See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977). Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'" Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966); Berkemer v.

---

[5]Moreover, based upon Wilson's uncontroverted testimony, we find that the circumstances of the identification were reliable, and do not demonstrate a very substantial likelihood of irreparable misidentification. Wilson stated that the cooperating defendant, upon viewing the photographic array, immediately, and unequivocally, chose Hernandez's photograph, reported several recent personal meetings with the person depicted in the photograph, and stated that the person depicted was the cooperating Defendant's supplier of methamphetamine. Accordingly, were we to reach the second prong of the inquiry, we would find, on this Record, that the identification was independently reliable.

McCarty, 468 U.S. 420, 428-29 (1984); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985).

If a person is subjected to a custodial interrogation, he or she "has the right to consult with an attorney and to have counsel present during questioning." Davis v. United States, 512 U.S. 452, 457 (1994). To exercise that right, however, a suspect "must unambiguously request counsel," which "'requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" Id. at 459, quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). Furthermore, "if a suspect makes a reference to an attorney that is ambiguous or equivocal * * * [such] that the suspect **might** be invoking his right to counsel, our precedents do not require the cessation of questioning." Id. [emphasis in original].

"The right to counsel recognized in Miranda is sufficiently important to suspects in criminal investigations, * * * that it 'requir[es] the special protection of the knowing and intelligent waiver standard.'" Davis v. United States, supra at 458, quoting Edwards v. Arizona, 451 U.S. 477, 483 (1981). Nevertheless, "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him." Id., citing North Carolina v.

- 17 -

Butler, 441 U.S. 369, 372-376 (1979); see also, United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994).   The burden rests with the Government to prove, by a preponderance of the evidence, that the Defendant knowingly and voluntarily waived his Miranda rights.  See, United States v. Ollie, 442 F.3d 1135, 1143 (8th Cir. 2006), citing Colorado v. Connelly, 479 U.S. 157, 168 (1986), and Brown v. Illinois, 422 U.S. 590, 603-04 (1975).  However, "Miranda has no application to statements * * * that are voluntarily offered and are not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response."   United States v. Griffin, 922 F.2d 1343, 1357 (8th Cir. 1990), citing United States v. McGauley, 786 F.2d 888, 891 (8th Cir. 1986), and United States v. Webster, 769 F.2d 487, 492 (8th Cir. 1985).

Further, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination.  See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000).  For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession."  Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.]   See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, [324 U.S. 401, 404] (1945)("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant").   The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing."   Stein v. New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly, 479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v. Denno, 347 U.S. 556, 561 (1954).   See also, Withrow v. Williams, supra at 693 (listing the applicable considerations).

The Sixth Amendment provides that, "[i]n all criminal trials, the accused shall enjoy the right * * * to have the assistance of counsel for his defense."  This right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment," and, once invoked,[6] may not be waived at subsequent police initiated interrogation.  See, Kirby v. Illinois, 406 U.S. 682, 689 (1972); see also, Patterson v. Illinois, 487 U.S. 285, 291 (1988);  Michigan v. Jackson, 475 U.S. 625, 636 (1986).  Thus, "if police initiate interrogation after a defendant's assertion [of the right to counsel], * * * any waiver of the defendant's right to counsel for that police initiated interrogation is invalid."  Michigan v. Jackson, supra at 636; see also, McNeil v. Wisconsin, 501 U.S. 171, 173 (1991).

Such a bright-line rule is "designed to prevent police from badgering a defendant into waiving his previously asserted [right to counsel]."  See, McNeil v. Wisconsin, supra at 177, quoting Michigan v. Harvey, 494 U.S. 344, 350 (1990).  However, "[i]f the person has not invoked [the right to counsel] * * * a waiver of the right may be made during police interrogation by the person acting alone."  Chewning

---

[6]"If the person has not invoked [the right to counsel] * * * a waiver of the right may be made during police interrogation by the person acting alone."  Chewning v. Rogerson, 29 F.3d 418, 422 (8th Cir. 1994).

- 20 -

v. Rogerson, 29 F.3d 418, 422 (8th Cir. 1994); Id. ("The right [to counsel arising under the Sixth Amendment] is not self-executing but must be invoked by the person claiming it."), citing Patterson v. Illinois, supra at 290, and Michigan v. Jackson, supra at 636; see, United States v. Hyles, 479 F.3d 958, 966 (8th Cir. 2007)("[The defendant's] waiver of his Miranda rights is enough to establish a knowing and intelligent waiver of counsel as long as that waiver was valid and as long as [the defendant] had not invoked his right to counsel before he waived his rights.").

2.    Legal Analysis.   Seebeck seeks to suppress the statement that he made to law enforcement during his two (2) custodial interviews of  October 18, 2006, and February 8, 2007.  On each occasion, law enforcement read the Miranda advisory to Seebeck, and he responded with an oral waiver.  However, Seebeck also seeks to suppress the statement that he made on February 8, 2007, before he waived his rights.  Further, Seebeck challenges the voluntary nature of the statement that he made on February 8, 2007, as he had consumed an unspecified amount of marijuana immediately prior to his arrest.  As each statement implicates different issues, we address each in turn.

a.    The Statement of October 18, 2006.    As an initial matter, no one disputes that Seebeck was in custody at the time that he made his statement,

or that he knowingly, voluntarily, and intentionally, waived his right to silence at the commencement of his interview by law enforcement.  At that time, Seebeck was read his <u>Miranda</u> rights, he acknowledged that he understood them, and he agreed to speak with the investigating authorities in the absence of legal counsel.  Although there is no evidence that Seebeck memorialized his waiver by signing a form, "[c]onsent can be given orally or in writing, and it is not necessary to use a written consent form." <u>United States v. Saenz</u>, 474 F.3d 1132, 1132 (8th Cir. 2007), citing <u>United States v. Siwek</u>, 453 F.3d 1079, 1084 (8th Cir. 2006).

Seebeck claims no physical or mental impairments, which would have made him susceptible to an unwitting waiver of his rights on October 18, 2006, and, on this Record, we find none.  The Record does not so much as intimate that, at the time that the <u>Miranda</u> warning was administered, Seebeck appeared to be under the influence of any drugs or alcohol.  Moreover, at no time did Seebeck request the interrogation to stop, nor did he ever request the presence of an attorney.  Further, there is no showing in the Record that law enforcement was informed, or became aware, that Seebeck may have retained counsel, in an open and separate criminal proceeding.[7]

---

[7]Given that the Superseding Indictment was issued on April 24, 2007, see, <u>Docket No. 153</u>, after Seebeck had made the statement that is the subject of this
(continued...)

- 22 -

"[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare."   United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2001), cert. denied, 533 U.S. 962 (2001), quoting Berkemer v. McCarty, supra at 433; see, United States v. Pierce, 152 F.3d 808, 813 (8th Cir. 1998). While the personal characteristics of a suspect, such as his age, mental capacity, and intoxication, are pertinent to a determination of voluntariness, see, United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 2005), coercive police conduct is a "necessary predicate" to finding a statement involuntary.  Colorado v. Connelly, supra at 167; Thatsaphone v. Weber, 137 F.3d 1041, 1046-1047 (8th Cir. 1998).  Moreover, a suspect's diminished mental capacity will not render a Miranda waiver unknowing

---

[7](...continued)
Suppression Motion, as well as the paucity of information referenced in Wilson's Affidavit of February 6, 2007, concerning the outcome of Seebeck's State criminal charges, see, Government Ex. 6, at p. 5-7, ¶20, it is unclear whether the Sixth Amendment right to counsel attached to Seebeck's statement, in the first instance. See, Von Kahl v. United States, 242 F.3d 783, 789 (8th Cir. 2001), cert. denied, 534 U.S. 941(2001), quoting McNeil v. Wisconsin, supra at 175.   "[T]he Sixth Amendment right to counsel 'does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." However, there is no suggestion in this Record, let alone evidence, that Seebeck alerted the questioning officers to any retention, by him, of legal counsel for any alleged criminal offense.

and unintelligent, where the suspect's mental capacity does not prevent him from "having a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998), citing United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994).

Here, the Record does not support a finding that the Seebeck's waiver of his Miranda rights was involuntary.  Notably, Seebeck has failed to identify any coercive conduct, on the part of Wilson or Nemerow, either prior to, during, or following, the waiver of his Miranda rights.  Instead, the Record reflects that Seebeck was advised of his Miranda rights prior to the interview; that no threats or promises were made by either of the Agents at any time during the interview; that the interview was of a relatively short duration; and that the interview ended when the Agents did not have further questions to ask.  Most importantly, there has been no showing that Seebeck ever requested the assistance of counsel, expressed any desire to have counsel present during the interview, or asked for the questioning to end.  Accordingly, we find that his statement was voluntary for the purposes of the Fifth and Sixth Amendment, and that Seebeck validly waived his rights.  As a consequence, we recommend that Seebeck's Motion to Suppress the statement made on October 18, 2006, be denied.

      b.    <u>The Pre-Waiver Statements of February 8, 2007</u>.  Seebeck argues that the statements that he made to officers following his arrest, and prior to the administration of his <u>Miranda</u> rights, should be suppressed, because it was uttered in the context of a custodial interrogation.   See, <u>Seebeck's Objections to Government Exh. 7</u>, <u>Docket No. 245</u>.  However, Seebeck represents that he has no other objection to the admission of the videotape, as to that statement.  <u>Id</u>.  In response, the Government advises that no such statements will be offered, in its case-in-chief at Trial, and accordingly, we deny Seebeck's Motion to Suppress his pre-Mirandized statement, on February 8, 2007, as moot.[8]

---

[8]The Government asks that we address the voluntariness of Seebeck's pre-<u>Miranda</u> advisory statement, as the Government may elect to use that statement if the Defendant exercises his right to testify at Trial.  See, <u>Government's Response to Seebeck's Objections</u>, <u>Docket No. 248</u>.  The Supreme Court has long recognized "that statements taken without Miranda warnings (though not actually compelled) can be used to impeach a defendant's testimony at trial, see [Oregon v.] Elstad, [470 U.S. 298,] 307-308, 105 S.Ct. 1285; Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), though the fruits of actually compelled testimony cannot, see New Jersey v. Portash, 440 U.S. 450, 458-459, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979)." <u>United States v. Patane</u>, 542 U.S. 630, 639 (2004); see also, <u>James v. Illinois</u>, 493 U.S. 307, 312 (1990)("In Harris v. New York, [401 U.S. 222 (1971), and Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), the Court applied the exception to permit prosecutors to impeach defendants using incriminating yet voluntary and reliable statements elicited in violation of Miranda requirements.").

    For reasons we detail in the text of this Report, insofar as they relate to the post-
(continued...)

c.    <u>The Post-Waiver Statement of February 8, 2007</u>.  Seebeck

has not proffered any substantive argument that law enforcement failed to comply

with any procedural requirements in advising Seebeck of his rights, or in obtaining a

waiver of those rights, as to any statement by Seebeck, after being given a <u>Miranda</u>

advisory.  Instead, Seebeck argues that his waiver was rendered involuntary, as he

contends that he had consumed an unspecified amount of marijuana "right before" law

enforcement arrived at his residence -- approximately one (1) hour prior to the

beginning of the interview -- so as  to execute the Search Warrant, and accordingly,

that he was under the influence of marijuana throughout the interview.

We are mindful of Seebeck's suggestion, that he could not effectively waive his

<u>Miranda</u> rights, since he was under the influence of marijuana at the time of his

interview but, even if we accepted Seebeck's claim of intoxication, that circumstance,

standing alone, would not vitiate the legitimacy of his <u>Miranda</u> waiver.  See, e.g.,

---

[8](...continued)

<u>Miranda</u> segments of the statement on February 8, 2007, we find that Seebeck's
statement was given voluntarily, and is not subject to any other constitutional defect --
except as to that portion taken in the absence of an effective <u>Miranda</u> warning.
Accordingly, we recommend that, if the portion of the statement, which the
Government concedes was given in the absence of a <u>Miranda</u> warning, is needed in
order to impeach Seebeck's testimony at Trial, the statement should be admissible for
that limited purpose.

United States v. Turner, 157 F.3d 552, 555-56 (8th Cir. 1998); United States v. Korn, 138 F.3d 1239, 1240 (8th Cir. 1998)("The Eighth Circuit has already stated that neither exhaustion nor intoxication will necessarily invalidate a Miranda waiver."), cert. denied, 525 U.S. 947 (1998), citing United States v. Byrne, 83 F.3d 984, 989 (8th Cir. 1996), and United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990), cert. denied, 499 U.S. 941 (1991).

As evident from the videotaped interview, Seebeck admittedly used marijuana prior to law enforcement's arrival at his residence.  However, Wilson testified, at the Hearing, that Seebeck did not appear to be under the influence at the time of his interview on February 8, 2007.  Wilson  stated that Seebeck was able to communicate, and answer questions coherently, and appropriately.  Moreover, as evident from the videotape, Wilson asked him if he understood the questions that were posed to him, and Seebeck was asked about the date, as well as his ability to recall the earlier events of the day.  Seebeck accurately identified the date, recognized that it was almost midnight, and cogently described the events of the day.  Seebeck further emphasized that he had a clear mind, and had no problem in understanding, or truthfully responding to, law enforcement's questions.   Accordingly, based on Wilson's

uncontradicted testimony,[9] we find that, despite Seebeck's claim of being under the influence, he voluntarily and effectively waived his <u>Miranda</u> rights, and provided a statement.  See, <u>United States v. Contreras</u>, 372 F.3d 974, 977 (8th Cir. 2004)(finding defendant's wavier of rights voluntary, "[a]lthough the record reveals that [the defendant] used methamphetamine the evening before and marijuana the day he gave consent, Agents Slosson and Larson both testified that [the defendant] appeared to be sober and in control of his faculties at the time he consented."); <u>United States v. Abfalter</u>, 340 F.3d 646, 652 (8th Cir. 2003)(finding that defendant's claim of intoxication owing to marijuana usage did not render waiver of rights prior to confession involuntary); cf., <u>United States v. Allen</u>, 40 Fed.Appx. 313, 314-15 (8th Cir. July 1, 2002)(deciding that the defendant did effectively and voluntarily waive his rights under <u>Miranda</u> even though he claims to have been under the influence of alcohol and methamphetamine, when he was apparently calm, alert, oriented, and appropriately answered the questions of the officers); <u>United States v. Turner</u>, supra at 555 (determining that the defendant failed to establish his waiver of <u>Miranda</u> rights

---

[9]We note that Seebeck did not offer any evidence, for the purposes of this Motion, that his faculties were impaired by marijuana, such that his waiver was rendered involuntary.  Further, we are presented with no reason to discredit Wilson's assessment of Seebeck, and this is particularly true after our review of the videotape of the interview on February 8, 2007.

was not knowing and intelligent because he was impaired by low I.Q., PCP intoxication, or mental illness).

In sum, when considered in its totality, the Record convinces us that Seebeck was properly advised of his right to silence, he understood that advice, he did not suffer from any inability to understand his rights because of mind-altering substances, and he voluntarily, and knowingly, elected to respond to official questioning without the presence of legal counsel. We further find no evidence that his statements to law enforcement were secured by threats, or unlawful promises. Therefore, we conclude that Seebeck knowingly, intelligently, and voluntarily, waived his rights under Miranda, and we find no responsible basis upon which to suppress the statement he made to Wilson and Nemerow on February 8, 2007. Accordingly, we recommend that Seebeck's Motion to Suppress his statements be denied in its entirety.

   C.   Seebeck's Motion to Suppress Evidence Obtained by Search and Seizure.

      1.   Standard of Review. In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral, and detached Judicial Officer, will assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search, or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband. See, Warden v. Hayden, 387 U.S.

294 (1967); <u>United States v. Johnson</u>, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996).  In order to find probable cause, it must be demonstrated that, in light of all the circumstances set forth in the supporting Affidavit, there is a fair probability that contraband, or evidence of a crime, will be found in a particular, designated place.  See, <u>United States v. Grubbs</u>, 547 U.S. 90, --, 126 S.Ct. 1494, 1499 (2006)("Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"), quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983).  For these purposes, probable cause is "a fluid concept, turning on the assessment of probabilities in particular factual contexts, not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, supra at 232; see also, <u>Ornelas v. United States</u>, 517 U.S. 690, 695 (1996).

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'" <u>United States v. Ryan</u>, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting <u>United States v. Goodman</u>, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999).  In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis.  See, <u>United States v. Anderson</u>, 933 F.2d 612, 614 (8th Cir. 1991); <u>Technical Ordnance, Inc. v. United States</u>, 244 F.3d 641, 649 (8th Cir.

2001), cert. denied, 534 U.S. 1084 (2002).  Moreover, the reviewing Court must not engage in a de novo review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant.  See, United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991).  This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants.  See, Illinois v. Gates, supra at 236.

"Probable cause must exist **at the time the search warrant is issued**." United States v. Gettel, 474 F.3d 1081, 1986 (8th Cir. 2007)[emphasis in original]; United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005); see, United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir. 1995), cert. denied, 516 U.S. 871 (1995).  Therefore, a lapse of time, between the observations of a witness and the issuance of a Search Warrant, like a delay in executing a Search Warrant, "may make probable cause fatally stale." United States v. Maxim, supra at 397 [quotations omitted]; see also, United States v. Gettel, supra at 1086.

"There is no bright-line test for determining when information is stale," and the passage of time, alone, is "not always the controlling factor," as other factors, such as

"the nature of the criminal activity involved and the kind of property subject to the search," are also relevant to the inquiry.   Id., quoting United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993); United States v. Gettel, supra at 1086; United States v. Rugh, 968 F.2d 750, 754 (8th Cir. 1992); see also, United States v. Kennedy, supra at 1141; United States v. Chrobak, 289 F.3d 1043, 1046 (8th Cir. 2002).   As but one example, when the Affidavit alleges an "ongoing continuous criminal enterprise, the passage of time between the receipt of information and the search becomes less critical in assessing probable cause." United States v. Rugh, supra at 754.   "[The] vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit," for "[t]ime factors must be examined in the context of a specific case and the nature of the crime under investigation." United States v. Gleich, 397 F.3d 608, 613 (8th Cir. 2005), quoting United States v. Koelling, supra at 822.

Furthermore, "'where recent information corroborates otherwise stale information, probable cause may be found.'" United States v. Ozar, supra at  1446, quoting United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990), cert. denied, 498 U.S. 1031 (1991).   "[T]he lapse of time is least important * * * when the [evidence of criminal activity] is not likely to be destroyed or dissipated." United

States v. Gleich, supra at 613, quoting United States v. Horn, 187 F.3d 781, 786 (8th Cir. 1999), cert. denied, 529 U.S. 1029 (2000), citing, in turn, United States v. Koelling, supra at 822-823.

       2.    Legal Analysis.  Seebeck has moved to suppress the evidence obtained during the execution of two (2) Search Warrants:  1) the search of his residence, vehicle, and person, on October 17, 2006;[10] and 2) the search of his residence, and person, on February 8, 2007.

      At the Hearing, Wilson testified that he compiled the facts, which were offered in support of the two (2) Search Warrants, and that he made no false statements in his Affidavits.  He further stated that he brought the Applications to the respective St. Louis County Judges, that he obtained their signatures,  that he relied on the Search Warrants in executing the searches and seizures, and that he had no reason to believe the Warrants were invalid.  Further, Wilson stated that law enforcement was monitoring Seebeck's activities, in the interim between submitting the Warrant Applications, and the execution of the issued Search Warrants.  Seebeck requests that

---

[10]At the Hearing, Wilson testified that the notation, on the associated Receipt, Inventory, and Return, which reflects that the Search Warrant was issued on October 10, 2006, instead of October 12, 2006, see, Government Exh. 5, at p. 3-1,was recorded in error by another law enforcement officer.  As Wilson's testimony is uncontroverted, we do not further address the discrepancy in the date contained on the Receipt.

we review the Search Warrants, and the Supporting Affidavits, in order to determine if the Warrants were supported by probable cause, or are subject to other fatal defects. We address each of the warranted searches, in turn.

a.    The Search Warrant of October 17, 2006.  On October 17, 2006, a Search Warrant was executed at Seebeck's residence, which is located in Duluth, Minnesota.  See, Government Exhibit 5, at p. 3-1.  The Warrant authorized a search for controlled substances, specifically methamphetamine; paraphernalia related to the use or distribution of methamphetamine; books and records which pertain to narcotics transactions; books, papers, and electronic devices, reflecting names, addresses, and telephone numbers; books, records, and documents evidencing the obtaining, secreting, transfer, or concealment, of assets or expenditures of monies; video and audiotapes of co-conspirators, assets, and controlled substances; United States currency, and other items which might constitute proceeds from the sale of controlled substances; items which show occupancy of the searched residence; photographs of co-conspirators assets, and of controlled substances; and permission to monitor and tape record all incoming phone calls during the execution of the Search Warrant.  The Warrant also authorized the search of Seebeck's person, as well as his vehicle.

In support of the Search Warrant Application, Wilson submitted an Affidavit which set forth the reasons that caused him to suspect that evidence of criminal activity would be found at Seebeck's residence. Wilson averred that information obtained from other members of the Task Force, as well as his past experience, led him to believe that persons trafficking in narcotics often keep detailed writings concerning their drug dealings and monies owed, in addition to the names of customers, and equipment used for weighing and/or packaging controlled substances. Persons trafficking in narcotics also would use their telephones to make arrangements for the purchase and sales of narcotics, and that persons would actually come to the residence of the dealer for telephone conversations, and that it was a common practice of drug traffickers to use electronic devices, and make audio or video recordings of their conversations and meetings.

Wilson also averred that Seebeck was charged in Saint Louis County District Court with Fifth Degree Possession of Methamphetamine in June of 2002, and that cooperating defendants, and anonymous tipsters, had reported that Seebeck had been a source and supplier of methamphetamine in the Duluth area, in April of 2003, and August of 2006, respectively. Wilson added that the cooperating Defendant made the statements against his/her own penal interest. In August of 2006, Wilson spoke with

at least three (3) of Seebeck's neighbors, who had reported short-term traffic coming and going from the residence during the daytime and nighttime hours which, Wilson avers from his experience and training, is consistent with drug dealing.

According to Wilson, in September of 2006, a confidential reliable informant ("CRI-1") reported that Seebeck was living at the Duluth residence named in the Warrant, and that Seebeck was selling, as well as using, methamphetamine. Wilson averred that CRI-1 had previously provided reliable information to law enforcement, which had been corroborated by a check of other police reports, information obtained from other law enforcement agencies, other confidential reliable informants, as well as Wilson's own personal knowledge. CRI-1 also was said to have provided information which led to the arrest of at least eight (8) individuals for possession and sale of substantial quantities of crystal methamphetamine.

Wilson averred that CRI-1 reportedly observed Seebeck, in September of 2006, in possession of methamphetamine, that was packaged for sale while driving his vehicle, and that Seebeck would commonly deliver methamphetamine during the night time hours using his vehicle. In October of 2006, as well as within a week of Wilson's Affidavit, law enforcement conducted two (2) controlled purchases of methamphetamine from Seebeck, at his residence, with the assistance of CRI-1. On

both occasions, Seebeck was observed in possession of methamphetamine.  CRI-1 also informed Wilson that Seebeck owns firearms, and has them readily available if needed, and that Seebeck had been charged in 1998 with, but not convicted of, being a felon in possession of a firearm.

Wilson attested that surveillance, which was conducted by law enforcement, as well as information provided by CRI-1, and Seebeck's presence at the controlled purchases, confirmed that Seebeck lived at the Duluth residence specified in the Warrant Application.  Wilson also stated that Seebeck had been observed, within five (5) days prior to the application for a Warrant, in possession of methamphetamine, which he was offering for sale.  During the prior seventy-two (72) hours, investigators with the Task Force conducted a third controlled purchase of methamphetamine from Seebeck, at which time, Seebeck drove the vehicle named in the Warrant, and sold a quantity of methamphetamine to CRI-1.  In addition, Wilson ran a criminal history check on Seebeck, and memorialized the results of that check in the Warrant Application.

On October 12, 2006, a Search Warrant was issued by the District Court of St. Louis County, Minnesota, and the Warrant was executed on October 17, 2006, at approximately 2:53 o'clock a.m.  The Receipt associated with the Search Warrant,

records that a number of materials were seized from Seebeck's residence, vehicle, and person. The objects primarily consisted of substances suspected to be marijuana, methamphetamine, packaging, drug paraphernalia, including pipes and scales, prescription pills, United States currency, indicia of residency, and miscellaneous documents and receipts. See, Receipt, Government Exh. 5.

At the outset, we recognize that a portion of the information, which is contained in the Affidavit, was supplied by a confidential reliable informant. Given the totality of the circumstances, we find that there was adequate probable cause to support the issuance of the Search Warrant for Seebeck's residence, vehicle, and person. We recognize that much of the information, which is contained in the Affidavit, was supplied by the CRI and, when probable cause for a Search Warrant is based upon information provided by an informant, the core question "'is whether the information is reliable.'" United States v. Warford, 439 F.3d 836, 841 (8th Cir. 2006), quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993); United States v. Koons, 300 F.3d 985, 993 (8th Cir. 2002); see also, United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)("[T]he informant's reliability, veracity, and basis of knowledge are relevant considerations -- but not independent, essential elements -- in finding probable cause.").

As our Court of Appeals has explained:

> In [Illinois v.] Gates, the Supreme Court explained that an informant's reliability and basis of knowledge "are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." * * * 462 U.S. at 233, 103 S.Ct. at 2329.

United States v. Olson, 21 F.3d 847, 850 (8th Cir. 1995).

As a result, "'an informant's basis of knowledge [is] an important consideration, but not a rigid requirement, in the probable cause determination.'"   Id., citing United States v. Anderson, supra at 615.

As a consequence, the "core question" is whether the information, which was provided by the informant, was reliable.  See, United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993)("The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable.").  In this respect, "[t]he statements of a reliable confidential informant are themselves sufficient to support probable cause."   United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998), cert. denied, 525 U.S. 919 (1998).  In turn, an informant is deemed reliable when his statements are corroborated by independent evidence.  See, United States v. Carpenter, 341 F.3d 666, 669 (8th Cir. 2003)("[C]orroboration of minor, innocent

details may support finding of probable cause."), citing <u>United States v. Tyler</u>, 238 F.3d 1036, 1039 (8th Cir. 2001); see also, <u>United States v. Koons</u>, supra at 993 ("'Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.'"), quoting <u>United States v. Fulgham</u>, supra at 401; <u>United States v. Formaro</u>, 152 F.3d 768, 770 (8th Cir. 1998)("[C]orroboration of the confidential informant's information by independent investigation is an important factor in the calculus of probable cause.").

Here, the CRI was known to law enforcement, see, <u>United States v. Solomon</u>, 432 F.3d 824, 827 (8th Cir. 2005), quoting <u>Florida v. J.L.</u>, 529 U.S. 266, 270 (2000)("[A] known informant * * * can be held responsible if her allegations turn out to be fabricated."), and the information that the CRI had provided to the officers, in the past, had resulted in the seizure of controlled substances, including methamphetamine, and had led to the identification of other methamphetamine distributors. See, <u>United States v. Leppert</u>, 408 F.3d 1039, 1041 (8th Cir. 2005) (reliability of informant's tip was established where informant had provided reliable information in the past, and at least some of the tip was corroborated by an independent investigation).

In addition, we find that Wilson reasonably relied upon the information provided by the CRI-1, because the information was given against the informant's own penal interest.  Id. at 1042 ("[A]n informant's statement against his or her own penal interests (even if others are also implicated) is presumptively credible * * *.").  Moreover, the information provided by the CI was confirmed by independent observations of Seebeck's person, and residence, by Wilson and other officers during the controlled narcotics purchases.  See, United States v. Rivera, 410 F.3d 998, 1002 (8th Cir. 2005) (informant's credibility was established where his representations were corroborated by officer surveillance and the recovery of narcotics from the informant following a controlled drug transaction).  Accordingly, we find that Wilson reasonably relied upon the information that was provided by the CRI.

We further find that the information that is contained in the Search Warrant, concerning the events of the preceding months, which culminated in Seebeck's arrest, had not become impermissibly stale by the time the Search Warrant was issued, and executed.  Not only did the information, which was provided by CRI, relate to an ongoing narcotics investigation, but it was adequately "freshened" by more current information from CRI-1, that was provided to Wilson within seventy-two (72) hours of the Warrant Application, and a mere five (5) days before the Warrant was executed.

- 41 -

See, United States v. Ozar, supra at 1446 ("'[W]here recent information corroborates otherwise stale information, probable cause may be found.'"), quoting United States v. Macklin, supra at 1326; see also, United States v. Morrow, 90 Fed. Appx. 183, 184 (8th Cir. 2004)("The seven-day delay did not render stale the information on which the Warrant was based."), citing United States v. Gibson, 123 F.3d 1121, 1124-25 (8th Cir. 1997)(four-day delay did not render the Warrant stale where drug activity was ongoing).[11]   Nor can it be responsibly argued that a sufficient nexus, between illicit drugs, and Seebeck's residence, had not been established, since the eyewitness accounts of the CRI, as well as Wilson's own observations during the surveillance of that residence, demonstrated a connection between Seebeck's residence, motor vehicle, his own person, and methamphetamine trafficking.

In sum, Seebeck alleges no other fatal defects in the Warrant and supporting papers, and our independent review has failed to uncover any, and therefore, we find

---

[11]Even if the information in the Search Warrant was impermissibly stale, we would be compelled, by the law of this Circuit, to find that the agents' reliance upon the Search Warrant was reasonable, because it "was not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon."   United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999)(applying Leon good faith exception to arguably stale Search Warrant), citing United States v. Leon, 468 U.S. 897, 922-23 (1984); see also, United States v. Gettel, 474 F.3d 1081, 1086 (8th Cir. 2007).

no basis to sustain a substantive challenge to the Warrant at issue.  As a result, we recommend that Seebeck's Motion to Suppress Evidence that was obtained from the execution of the Warrant on October 17, 2006, be denied.

      b.    <u>The Search Warrant of February 6, 2007</u>.  On February 8, 2007, a second Search Warrant was executed at Seebeck's residence, and upon his person.  As was true for the Warrant that was executed in October of 2006, the second Warrant also authorized the officers to search for narcotics, and other evidence of narcotics related activities.  See, <u>Government Exhibit 6</u>.

      The Affidavit that was submitted along with the Search Warrant Application of February 6, 2007, was also prepared by Wilson, and it contained a number of the same averments that were incorporated in the earlier Affidavit of October 12, 2007.  Specifically, both Affidavits contained the same averments concerning Wilson's training, experience, and background; the information that was provided by CRI-1; the conduct of the three (3) controlled narcotics purchases, but also detailed the materials which were recovered during the search on October 17, 2006, of Seebeck and his residence.

      In addition to the information that was provided in the Affidavit of October 12, 2006, Wilson averred that another controlled purchase had been conducted, with the

assistance of CRI-1, within the two (2) weeks preceding the Warrant Application, and that on at least three (3) occasions within the preceding week -- including within the seventy-two (72) hours preceding the Application -- CRI-1 had observed Seebeck in possession of "a significant quantity of methamphetamine which Seebeck was offering for sale." Id. at p. 5-7.  CRI-1 also reported that Seebeck continued to sell, and use methamphetamine, "since his release from jail on the previously mentioned methamphetamine sale charges." Id.

Based upon those averments, we also find probable cause to believe that evidence of criminal activity was present, on Seebeck's person and his residence in February of 2007.  For reasons we have previously addressed, as well as the more recent information obtained from CRI-1 -- including yet another controlled purchase of methamphetamine -- there was probable cause, which was not impermissibly stale, to believe that contraband, and evidence of criminal activity, would be found on Seebeck, and at his residence, at the time that the Search Warrant was executed on February 8, 2007.  Therefore, we find no constitutional infirmity in the warranted search of Seebeck, and his residence, and we recommend that the Motion to Suppress Evidence obtained from the warranted search on February 8, 2007, be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

1.    That the Motion of the Defendant Martin Vega Hernandez to Suppress Eyewitness Identification [Docket No. 234] be denied.

2.    That the informal Motion of the Defendant Michael Eugene Seebeck to Suppress Statements be denied.

3.    That the informal Motion of the Defendant Michael Eugene Seebeck to Suppress Evidence Obtained by Search and Seizure be denied.

4.    That the Government's informal Motion to allow the admission of the pre-Miranda statement by the Defendant Michael Eugene Seebeck, during his interview of February 8, 2007, be granted for the limited purpose of impeaching that Defendant, in the event that Seebeck testifies at the time of Trial.


Dated:  July 16, 2007                 s/Raymond L. Erickson
                                      Raymond L. Erickson
                                      CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 2, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 2, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.